******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

PALMER, J., concurring. I agree with the result that the majority reaches, and with nearly all of its thoughtful analysis, because I agree that, under the facts of this case, any failure by the state to disclose an agreement it allegedly had with one of its cooperating witnesses, Edwin Soler, for leniency in exchange for his trial testimony against the petitioner was not material for purposes of *Brady* v. *Maryland*, 373 U.S. 83, 87–88, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and its progeny. I write separately, however, to discuss briefly the issue that, for purposes of this case, we need not, and do not, decide, that is, whether any such agreement actually existed.

As the majority explains, at the petitioner's trial, Soler testified that he had been made no promise of any benefit by the assistant state's attorney (prosecutor), that he didn't expect to receive any consideration for his testimony, and that he was testifying solely because it was "the right thing to do." At the habeas trial, the prosecutor's testimony was consistent with Soler's, as was the habeas testimony of the attorney who represented Soler in his criminal case. On the basis of this testimony, the habeas court found that there was no undisclosed agreement, and the Appellate Court upheld the habeas court's determination, even though representations by the prosecutor at Soler's sentencing suggested that he had told Soler's counsel that Soler might well receive a substantial reduction in both the charge and sentence if he testified against the petitioner.[1] In fact, however, the prosecutor elected not to pursue the felony murder charge, and Soler received a total effective prison sentence of nine years, far less than the mandatory minimum twenty-five year sentence he otherwise faced on the felony murder charge.[2] Needless to say, any witness who had reason to believe that he might receive such a benefit for cooperating with the state would have a strong incentive to do so and would be subject to cross-examination concerning that obvious and compelling motivation.

Although I have no reason to second guess the habeas court's finding that there was no formal or definitive agreement that Soler would receive a particular benefit in exchange for his testimony, it seems clear that, at the least, there was an understanding between the state and Soler that he would receive consideration in return for his testimony against the petitioner. In fact, the majority acknowledges this fact in commenting on what it characterizes as "the state's practice"—employed by the state in the present of case—"of informal, off-the-record leniency understandings with cooperating witnesses." As the majority also recognizes, these understandings "can prevent defense counsel from effectively

impeaching the witness for [interest or] bias, perhaps leaving jurors with the impression . . . that [the witness had no] incentive to testify favorably for the state." (Internal quotation marks omitted.) And I also fully agree with the majority's observation that "[j]urors are not well versed in the nuanced vagaries of such leniency agreements. Yet, we rely on jurors to assess a witness' credibility—including a witness' motivation to testify—while withholding from them critical information that would help them assess just how motivated that witness might be." Because it is contrary to the vitally important principles underlying *Brady*, "[t]his practice," the majority rightly concludes, "carries with it risks that threaten the . . . fair administration of justice." Indeed, such understandings, although informal and perhaps somewhat undefined, are no less a motivating factor for a cooperating witness than a more formal cooperation agreement. This is so because, for all practical purposes, an understanding between the state and the witness is really no different from an agreement between the two.

I therefore join the majority in urging that measures be taken, by the state and, if necessary, by the trial court, to ensure that "understandings" of the kind at issue in the present case be disclosed to defense counsel so that a cooperating witness may be questioned effectively about that witness' true motivation for testifying. Although it may be understandable, as the majority observes, for the state to be "concerned about making actual, enforceable promises to the cooperating witness because it does not want to commit to a precise outcome until the witness has testified," that concern is readily addressed by the use of a properly crafted cooperation agreement, which is common in virtually all jurisdictions, both federal and state. And although it also is understandable that the state would prefer testimony from a cooperating witness simply denying the existence of any agreement or promise—exactly what occurred in the present case—such testimony does not accurately reflect the true nature of the understanding or arrangement between that witness and the state.

It seems clear that written cooperation agreements are the fairest and most accurate way to identify and memorialize any understanding that exists between the state and a cooperating witness. In contrast to the majority, I do not believe that the use of such agreements would present any serious administrative difficulty for the state—those agreements need not be lengthy or complicated—and any modest inconvenience that might result from their use would be far exceeded by their value in promoting fundamental fairness in cases involving cooperating witnesses. That is why in federal court, such agreements are routinely reduced to writing and submitted to the court. See United States Sentencing Commission, Guidelines Manual (2018) § 5K1.1, p. 467. I therefore commend the

matter to the Rules Committee of the Superior Court for its review and consideration.

Finally, it is well known that, on the recommendation of the prosecutor, cooperating witnesses in this state invariably receive significant consideration from the court for their cooperation, and, again, that is precisely what happened in the present case. As the majority aptly explains, "experienced [defense] counsel operating in a courthouse in which he or she is familiar with the practices of prosecutors and presiding judges can comfortably advise the witness of the possible credit that might follow from his [or her] testimony." Of course, I have no quarrel with that practice, for the reality is that the state needs to provide an incentive for certain witnesses—many of whom, like Soler, were themselves involved in the underlying crime—to testify on its behalf. Nevertheless, at trial, the state cannot fairly pretend that there is no understanding that the cooperating witness will receive a considerably more lenient sentence than he would have received if he had not cooperated; indeed, it is virtually inconceivable that a witness who decides to cooperate will not have been advised by counsel, in one way or another, that his cooperation will result in a markedly reduced sentence. Consequently, if other approaches to identifying the true nature of that understanding are not undertaken by the state or the trial court, defense counsel may find it necessary to seek a jury instruction explaining that when the cooperating witness is sentenced, he reasonably can expect to receive a very significant benefit—that is, a significant reduction in his sentence—for his cooperation. Such an instruction would help alleviate the serious unfairness that arises when jurors are misled into believing that a cooperating witness—who, unbeknownst to the jurors, can expect to receive a reduced sentence in return for his or her cooperation with the state—is testifying only because "it's the right thing to do."

I respectfully concur.

[1] More specifically, the prosecutor told the court at Soler's sentencing that "the state had represented to [Soler's] counsel that, in the event that [the petitioner] chose to proceed to trial and that . . . Soler's testimony would be needed and would, in fact, be forthcoming and be proffered truthfully . . . the state would sort of come off the felony murder [charge] and charge various counts of robbery or some of the substantive offenses in lieu of . . . felony murder since that would have a minimum mandatory of twenty-five years to serve."

[2] The petitioner, who, according to Soler and other witnesses called by the state, was the shooter, received a total effective prison sentence of thirty-five years.